## HIGHWAY INS. UNDERWRITERS v. COLEMAN.

### No. 4720.

Court of Civil Appeals of Texas. Beaumont.
Feb. 15, 1951.

Rehearing Denied May 9, 1951.

Strasburger, Price, Holland, Kelton & Miller, Dallas, Everett Lord, Beaumont, for appellant.

Mike Daughtry, Beaumont, for appellee.

R. L. MURRAY, Justice.

This is a Workmen's Compensation case in which Julian Coleman, as plaintiff below, has sought to recover compensation on the basis of total permanent disability upon the allegations that the said Coleman had sustained an injury on or about September 9, 1949, while working in Jefferson County, Texas, for Powell Transfer & Storage Company, said employer having a policy of compensation insurance with Highway Insurance Underwriters, defendant below.

The jury returned a verdict finding Coleman to be totally disabled and that such disability would last for 8 years.

Judgment was accordingly rendered in favor of Coleman for 401 weeks' compensation, the maximum allowed by law.

After the overruling of its amended motion for a new trial, duly and timely filed and presented, appellant, the defendant be-

low, has duly perfected its appeal to this court.

The appellant brings the appeal upon four Points of Error, which are as follows:

Point 1. The error of the trial court in refusing to grant the defendant below a new trial because the jury's finding that Coleman would be totally disabled for 8 years, is not supported by the evidence in the case and is so contrary to the overwhelming preponderance of evidence, including the testimony of Coleman's own doctors, as to indicate that the jury must have motivated by some improper bias or prejudice.

Point 2. The error of the trial court in refusing to grant the defendant below a new trial because of the highly improper argument of the attorney for the plaintiff who argued to the jury that if the plaintiff had had a back injury at some time prior to the date of the accident involved in this case the defendant would certainly have brought in witnesses to prove it, there being no showing of available witnesses known to the defendant.

Point 3. The error of the trial court in refusing to grant the defendant below a new trial because of the highly improper argument of plaintiff's attorney in criticizing Mr. Strasburger, attorney for the defendant without any justification therefor.

Point 4. The error of the trial court in refusing to grant a new trial because of the highly improper argument of plaintiff's attorney in telling the jury that the insurance company had accepted the premiums on the policy, the question of payment of premiums not being pertinent to any issue in this lawsuit.

The appellant's first point is overruled. We have examined the entire statement of facts and find the evidence sufficient to support the findings of the jury with regard to the accidental injury to Coleman's back, the nature and extent of his injury and the probable length of time during which his disability will continue. Coleman, the appellee, was a Negro man about 27 years of age. He was raised on a farm in Alabama and went as far as the second grade at a farm school there. He farmed with his father who was a tenant

farmer in Alabama and did other farm work until after he was grown and married and until the war was over. After the war was over, he worked in a mine in Kentucky and then Cameron, Louisiana, where he worked on a commercial fishing boat. He then worked for a shipyard in Port Arthur, cleaning and sweeping ships. He had gone to work for Powell Transfer & Storage Company, his employer at the time he was injured, about two weeks before he was hurt. He and another Negro man operated a transfer truck for their employer. On September 9, 1949, he and the other man were sent to move some household goods from one house to another in Port Arthur. A large upright piano was one of the items of furniture they were required to carry from the house and place in their truck. The owner of the furniture suggested to them that the piano was too big for two men to handle and called their employer to that effect. The other Negro, who seems to have been the headman of the operation, also called his foreman back at the office and told him it was a pretty big piano for two men to move. The foreman told him that he had moved "lot heavier things than that" and he declined to send any additional help. The men rolled the piano to the front of the house and at the edge of the porch there was a gang-plank leading from the step to the sidewalk. The two of them carried the piano down to the ground and put it into the truck. According to Coleman's testimony he was at the front or lower end of the piano, facing the piano and backing down the gang-plank. As they got the piano to the ground, Coleman testified something came loose in the lower part of his back and it felt like something pulled loose in the lower part of his back. He said he told the other man that he believed he hurt his back. They stood and rested awhile, then put the piano in the truck and delivered it. He continued to work the rest of the day moving some more furniture. He said that when he was moving his back would be all right, but when he would stop it got to hurting, "as long as I was moving it wouldn't hurt me much pain, just a little bit, but when I stopped it give out on me", he did not tell his foreman of his injury that

Saturday night, the day of the injury, because when he got to the office the foreman was "eating out" the other man for something he had done and he just wouldn't say anything about it. That night when he began to get stiff and cold and couldn't move, his friends put some linament on him. The next morning he phoned his foreman and asked for a doctor. The foreman sent out Dr. Tritico, who rubbed his back and gave him three capsules and sent him some more medicine later that evening. The next day, Monday morning, he called the foreman and asked for a doctor again and went in a cab to another doctor, Dr. Raines. Dr. Raines gave him some shots in the back and some antiseptic and other medicine. The second day following, he was taken to St. Mary's Hospital in Port Arthur where he stayed for ten days. X-ray pictures were taken by various doctors and he was examined and treated by several more. Coleman testified that he had never been hurt or claimed to be injured at any other jobs he had had. Willie Joiner, the other man with Coleman on the truck testified that the lady who owned the furniture they were moving had told him that two men were not enough to handle the big piano and he rang up the boss and told him they had an upright piano and needed more help. He said that he was on the back end and Coleman was on the front and that he did see Coleman go down to his knees while they were lowering the piano. We think this is ample evidence to support the jury's finding that Coleman suffered the accidental injury to his back.

As to the nature and extent of the back injury, over one-half of the 275 pages contained in the statement of facts is devoted to medical testimony. Dr. Kuhlman made X-ray pictures of Coleman on September 15, 1949, which was six days after the accident. He testified as to the X-ray pictures he took and also pictures of Coleman taken by another X-ray specialist on October 13, 1949. According to his testimony Coleman had a curvature of the spine; he had a small spur on the fourth lumbar segment of his spine, which was in his opinion definitely old; it could not have formed between the time the man was hurt, September 9th, and the day of taking the pictures,

September 15th; he found no indication from these X-rays of a compression fracture. He further testified that the curvature or scoliosis was not a disabling condition, that a great many people have that much curvature and don't know they have it. He further testified that in the latter picture taken October 13, 1949, there was no indication of a compression fracture; that he found there the same condition as was X-rayed by him September 15, 1949. Dr. J. M. Raines, a doctor of medicine, testified, however, that he had treated Coleman at St. Mary's Hospital when he first went there; that he had Dr. Kuhlman make the X-ray pictures for him; that Dr. Kuhlman reported that Coleman had no bony pathology in his back so Dr. Raines continued to treat him for lumbosacral strain; that he injected his back once with novocain; that Coleman continued to complain of pain after he went home from the hospital and he continued to treat him at his house, where he injected his back with novocain and gave him codine and aspirin to relieve his pain. He further testified that if there was an elongation of the inferior aspect of the fourth lumbar present and reflected in that picture, it was Dr. Kuhlman's duty as an X-ray specialist to report that matter to him; that if at that time the normal concavity of the body of the fourth lumbar was absent it was his duty to report that to Dr. Raines; that if the condition of the fourth lumbar had changed at that time from a square to a rhomboid appearance it was Dr. Kuhlman's duty to report that to him; that if there was an abnormal enlargement at the bottom of the fourth lumbar segment it was Dr. Kuhlman's duty to report that to him; that if those four conditions had existed in the man's lumbar at that time, they would be classed as deformities of the vertebra. Another X-ray specialist, Dr. Catalano, made X-ray pictures of Coleman on October 13, 1949, and on March 13, 1950, the day before the trial began. He testified that the October 13, 1949, picture showed the four abnormalities of the spine referred to in Dr. Raines' testimony above. He also testified that the pictures taken on March 13, 1950 showed that the scoliosis, the curvature of the spine, was more pronounced in

the new film than in the old one; that the elongation, hypertrophic spur and other deformities of the fourth lumbar are relatively unchanged. Dr. Catalano further testified that in his opinion those abnormalities in the spine were the result of a compression fracture. Dr. G. B. Stephenson, testifying for the appellant, stated that he was an Orthopedic Surgeon who had been practicing in Beaumont since 1936, and he examined Coleman on February 24, 1950, a few weeks before the trial. He gave him a full examination, to determine the presence or absence of any limitation of motion in the back and the presence or absence of muscle spasm. He testified on direct examination that his response to all these tests was normal; that he also took X-rays of Coleman's back and from his examination of those X-rays he found no evidence of an accident of any kind. He presented the pictures while on the stand and testifying in regard thereto he pointed out some abnormalities in the X-ray pictures which he took, but testified that they were not significant, and that he did not believe they were of a disabling nature or would prevent a man from doing normal work such as from moving household furniture; that he believed that the day he examined Coleman, Coleman could return to work; he further testified that he did not see any evidence of compression fracture in any of the pictures that he had seen there at the trial. A great deal of Dr. Stephenson's testimony on direct examination is quoted in appellant's brief. None of his testimony on cross examination by the appellee is set out by the appellant. On cross examination Dr. Stephenson testified that the normal concavity of the body of the fourth lumbar was not a normal concavity; it was not a square and was not shaped as it ought to be; that that could have been the result of a compression fracture; that that was what he would expect from a compression injury, "yes, just what we have got in this fellow's fourth. It is wider, has lost its concavity, lost its shape, where it shoud be square it is rhomboid and the others adjoining it have a perfectly normal appearance, that is what you get in compression fracture, squashing"; that if a person gets one of those compression fractures, to get the type of treatment he should have, he should be hospitalized immediately; that if he does not do so but goes on and moves a piano and does some more work and goes riding in a taxicab that would aggravate any injury. He further testified as follows:

"Q. This picture we have given of his back is a classic picture of the segment of the spine as it should look if it has suffered a compression fracture, no question about it? A. That is true." Dr. Stephenson further testified that the curvature of the spine was increased between October 13, 1949 and the picture made in March, 1950; that there is an increase in the lordosis; that there was a difference in the curve and that "indicates that the mechanics of this spine are out of whack, they are not normal, not working as they should"; that from the appearance of the two films and from the appearance of the film it is progressing; that from the appearance of the films and a fair deduction therefrom his spine is out of its mechanical function. On recross examination Dr. Stephenson was interrogated further in regard to Dr. Kuhlman's report of his interpretation of the X-ray pictures that he took. He testified that Dr. Kuhlman's report said "low lumbar scoliosis present, probably postural in origin since no deformity of vertebral bodies is present to explain it. No evidence of recent or old fracture or dislocation;" that in Dr. Stephenson's X-ray pictures he found at least five deformities present in February, 1950. Dr. Ferguson testified in behalf of the appellee and stated that at the time of the trial Coleman's condition was still progressing; that he should not indulge in hard manual labor; that if he undertakes manual labor at the time it is the medical prognosis that it might cause the utter destruction of that vertebra; that he doubted that there was a possibility or a reasonable probability of this man's being able to do hard manual labor. We think the testimony amply supports the findings of the jury in regard to the nature and extent of Coleman's injuries and disabilities, and as to the duration of his disability.

Appellant's Bill of Exceptions No. 1 is the basis of its second point and a portion of it reads as follows: "and be it further remembered that upon the trial of the above styled and numbered cause Mr. Mike Daughtry, attorney for plaintiff, made the following argument to the jury:

"* * * in other words, I am trying to show you if there is any back injury in this man's life, if he had ever actually suffered one, that certainly they would have dredged up, if you can dredge up such claptrap as Williard W. Knight in the Candry-Dripper and Clyde Nichols, a Negro automobile salesman. Dr. Catalano, that is the fellow here that Dr. Ferguson referred the man to, was badgered on the stand by counsel and said could this have come on in three months? It could have been six months, it could have been a year." The appellant in its brief does not so advise the court but the trial court qualified the above portion of appellant's Bill of Exceptions as follows: (a) No objection was made to the argument at the time same was made; and (b) that the argument was supported by the evidence and reasonable inferences arising therefrom. Appellant says that this type of argument was improper and harmful when we recall the testimony of the medical witnesses offered by it, "indicating that if Coleman had any back condition it was not the result of a recent injury but was of long standing." We need hardly repeat here that we do not agree with appellant's view of the effect of appellant's medical witnesses, particularly the testimony of Dr. Stephenson. If there was impropriety in the argument we do not regard it as of such a vicious type that an instruction by the court after a proper objection could not have cured the harmful effects of the argument. Since counsel made no objection to the argument at the time, we believe he waived whatever error was present. Ramirez v. Acker, 134 Tex. 647, 138 S.W.2d 1054.

Under appellant's third point it complains of portions of the argument of Mr. Mike Daughtry, counsel for appellee in the trial of the case, which it says were highly improper because he criticized Mr. Stras-burger, attorney for the appellant on the trial of the case, without any justification therefor. Seven portions of the argument are quoted by the appellant in its brief, but again the appellant has failed to advise this court in its brief that the trial court qualified the Bill of Exceptions as to the criticisms complained of to the effect that no objection was made to the argument at the time the argument was made, except as to paragraphs 4 and 5; and that all of the argument complained of was made in reply to the argument of appellant's counsel, and was provoked by said counsel.

Under this point the appellant complains of the following portions of the argument of Mr. Mike Daughtry:

"Gentlemen, I have been practicing law here in this county for a quarter of a century and I have never been subjected to the indignities I have under Mr. Strasburger. I am not going to reply to them in kind. That is not the school of law I went to. I never saw a lawyer engage in so many cheap theatricals to a Jefferson County jury, go around pointing out on the walls the scales of justice."

"He says you must not believe anybody that has an interest in this case. I don't think that gentlemen. I don't think that of Dr. Stephenson. You pay a doctor when he comes to court. I don't believe that Dr. Ferguson, who has been practicing medicine here for thirty-nine years, and Dr. Raines, who has been in Port Arthur for a number of years, are rascals because of money * * *."

The objection to this by Mr. Strasburger was: "Your Honor, I want to except to that argument. I didn't say that anybody was a rascal. I said they would unconsciously fudge some."

Mr. Daughtry's reply was at follows: "Fudge. I don't think they would fudge is my opinion about it, either one of them. That negro boy back there might. He says that Negro is the most interested person in this lawsuit, and I tell you that isn't true. The most interested person in this lawsuit is this insurance carrier that has written this workman's compensation on this man

and now wants the jury to pay him in cheap jokes, theatricals and * * *." Mr. Strasburger's objection was: "Your Honor, we except to that as being improper and prejudicial and inflammatory, that we are the only ones interested, engaged in cheap theatrical jokes." The trial court overruled the objection. We note that Mr. Daughtry said "most interested", Mr. Strasburger said "only one interested".

"I straddled the board simply because counsel said, 'why, that board can't be straddled.' If this jury is to laugh it out the window, maybe a Jefferson County jury would do that, you might go for theatricals, you might quote Kipling, a great English poet, when he wrote: "The tumult and the shouting dies; the captains and the kings depart," but what does that have to do with whether or not this negro boy got hurt out there? That is a bunch of claptrap and I don't believe a Jefferson County jury * * you might do it somewhere but I just believe that Jefferson County jurors are too intelligent to listen to such stuff where the rights of a man are involved."

"Maybe a jury will, but I couldn't believe it, even though this is a black man, that twelve men under their solemn oath could be swayed by quotations by Kipling or reducing me to a rooster and cheap theatricals pointing out the scales of jusice."

"Maybe so, but you are told that this is not a share-the-wealth case, and gentlemen it is not. This is a case where an organization has undertaken to insure the employees of Powell Transfer Company and pay them if they are injured in the course of their work. The law that governs any workman, black and white, they have undertaken to insure him and now a man is hurt, and there comes a day of accounting in the courthouse, and he is to be paid by abuse of his counsel, by quotations from Mr. Kipling, and by an assertion that a doctor of thirty-nine years of practice will come and tell you a falsehood for money, and in addition throw in a few bum jokes about a sorrel horse and Johnny is out of step'. A Jefferson County jury may listen to that kind of stuff." "Now there comes a time to dis-

charge that obligation, may it please the jury. If this jury will say to them solemnly, 'You have undertaken this obligation, this man is hurt, he is totally disabled, and now it may be said upon your part that you have made this contract, the contingency has happened, and now you go pay it, and we are not going to be influenced by cheap theatricals or otherwise in the trial of this man's case, just like I would have him try mine, and that is what you said before, when you have done that, as I said before, it is not going to make me sick whatever you do. We want to stay friends. If you decide this lawsuit against me it's all right. I don't get sick, but if you decide this case against me I will enjoy some cheap theatricals too. I hope you will live that long, but I don't want you to consider my hope in deciding if this darkey got hurt, how bad he got hurt and how long he will have it. Even with my good wishes, he is a black man, the jury is here for him, for me, and for all of us, and a man's rights are not to be joked upon and thrown out the window. They are to be on solid merits."

The appellant says this constitutes improper criticism of Mr. Strasburger, its attorney, without justification, to such an extent as to require a reversal. It is apparent from the language of the argument complained of that a great many things must have occurred during the argument which are not shown in detail by the Bill of Exceptions. We infer from the language of exceptions, however, that Mr. Strasburger had in his argument quoted from the poetry of Rudyard Kipling and had, when Mr. Daughtry had straddled the plank to show that such a feat was possible, likened him to a rooster in so doing, and had pointed out the symbols of the scales of justice adorning the walls of the courtroom where the case was tried, and that he had argued that an interested witness would unconsciously "fudge" some in his testimony. We may also assume that Mr. Strasburger had told some jokes, although we do not assume that they were "bum jokes". Whether jokes deserve this term is always a matter of personal taste, but we have observed that any one who indulges in telling jokes runs the

risk of having some of his listeners so classify them. The argument was in answer to argument of opposing counsel and was provoked by opposing counsel.

▪ In its brief the appellant asserts that all of the argument complained of shows that the attorney for the appellee was indulging in highly improper criticism of counsel for the appellant without justification. We do not believe the argument complained of now is subject to that criticism and the appellant's third point is overruled. The only part of the argument which was objected to on trial was that portion wherein Mr. Daughtry was replying to Mr. Strasburger's argument that interested witnesses would unconsciously fudge and in which Mr. Daughtry argued that the most interested person in the lawsuit was the insurance carrier that had written the compensation insurance and then wanted the jury to pay him in cheap jokes and theatricals. We think the trial court properly overruled the objection, and that the argument was not the unjustified criticism of counsel such as would require a reversal of the case.

All the other portions of the argument complained of here were made without objection at the time the argument was made. They appear to be in answer to and provoked by counsel for the appellant, and we do not believe the trial court was in error in declining to grant a new trial because of them.

■ Under its fourth point the appellant complains of the following portion of Mr. Daughtry's argument to the jury: "They may not sit down calmly and decide this man's rights under this insurance policy. They accepted premiums and made a solemn contract to pay him." The trial court qualified this portion of the Bill of Exceptions with the statement that the argument complained of was invited and provoked by the argument, conduct and statements of appellant's counsel. As was said by the court in National Life and Accident Insurance Company v. Harris, Tex.Civ.App., 118 S.W.2d 838, in considering a similar argument of counsel, the materiality of this argument is not apparent but on the whole

we do not think it shows reversible error. All members of the jury must have known without being told by the argument of the counsel that the insurance company had, as all such companies do, accepted premiums and had executed the policy of workman's compensation insurance sued upon. We do not believe that any jury could have been unduly influenced to the harm of this appellant by this argument.

The judgment of the trial court is affirmed.